### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| COMMUNICATION DYNAMICS, INC. | ) | |
| et al. | ) | Case No. 02-12753 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| CDI TRUST, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. ELECTRONICS, INC., n/k/a | ) | Adv. No. 05-30276 (MFW) |
| ICX GLOBAL, INC., | ) | |
| Defendant. | ) | |

### OPINION[1]

Before the Court is the Motion for Summary Judgment filed by
the CDI Trust (the "Trust") on Counts I through IV of its
Complaint seeking to collect $4,435,725 due under two notes from
U.S. Electronics, Inc., n/k/a ICX Global, Inc. ("ICX").  ICX
opposes the Motion.  For the reasons stated below, the Court will
deny the Motion.


I.  BACKGROUND

On May 8, 2002, Communications Dynamics, Inc. ("CDI") and
its subsidiary, US Electronics, Inc. ("USE Delaware") entered
into an asset purchase agreement (the "APA") with USE
Acquisition, LLC (the predecessor to ICX) pursuant to which ICX

_____

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

acquired certain business assets of USE Delaware for a purchase price of $25 million.  ICX paid $20 million in cash and delivered two notes (the "USE Notes") in the face amount of $5 million.  At about the same time,[2] ICX, CDI and another of CDI's subsidiaries, TVC Communications, Inc. ("TVC"), executed a Distribution Agreement pursuant to which TVC obtained the exclusive right to market and committed to purchase a minimum amount of the product now manufactured by ICX.  Pursuant to the Distribution Agreement (and the USE Notes), ICX gave a discount to TVC in the amount of 25 cents for each unit it sold, which discount was credited against the principal due by ICX under the USE Notes.

On September 23, 2002, CDI and several of its affiliates, including TVC (collectively the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code.  Because TVC had purchased substantially fewer units than it was obligated to buy under the Distribution Agreement, ICX expressed concern about TVC's ability to comply with the Distribution Agreement and the preclusive effect TVC's exclusivity rights had in allowing ICX to mitigate its damages.  Given the size of the cure payment (approximately $1.3 million), and ICX's expressed desires, the Debtors agreed to reject the Distribution Agreement and enter into a new non-exclusive manufacturer's representative agreement (the "NEMRA").  A Motion was filed seeking authority for that

---

[2]  The Distribution Agreement was executed twelve days later on May 20, 2002.

arrangement, which was approved by the Court on May 21, 2003.

On July 28, 2003, within the time set by the Court to file any rejection damages claims, ICX filed a secured proof of claim in the amount of $4,835,000 and an unsecured proof of claim in the amount of $10,130,000 for its rejection damages. ICX asserts that the secured claim represents the portion of its rejection damages which is subject to setoff or recoupment against the sums it owes on the USE Notes.

On February 26, 2004, the Court confirmed the Debtors' plan of reorganization (the "Plan"). Pursuant to the Plan, the Senior and Subordinated Lenders entered into a settlement (the "Global Settlement Agreement") with the Debtors and the Creditors' Committee. As part of the Plan, the Debtors transferred certain property and rights to the Trust, including the USE Notes, to collect and distribute to creditors.

On November 30, 2005, the Trust filed a complaint (the "Complaint") against ICX seeking (1) an accounting and turnover of the amounts due under the USE Notes under § 542(a); (2) to compel ICX to pay the full value of the USE Notes under § 542(b); (3) recovery of damages for ICX's breach of the USE Notes; (4) a declaratory judgment that ICX has no right of setoff against the USE Notes; (5) disallowance of ICX's claim for damages for rejection of the Distribution Agreement; and (6) subordination of ICX's claims to unsecured status. On January 13, 2006, ICX filed an answer denying the allegations of the Complaint and asserting

3

certain affirmative defenses, including the right of setoff.

On June 1, 2007, the Trust filed its motion for summary judgment.  ICX filed its brief in response on July 16, 2007.  On August 10, 2007, the Trust filed its reply.  On August 17, 2007, a notice of completion of briefing was filed.  The matter is ripe for decision.

## II.   JURISDICTION

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 & 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), & (O).

## III.  DISCUSSION

### A.   Standard for Granting Summary Judgment

The Court should grant a summary judgment motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See, e.g., Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 164 (3d Cir. 1999).  The movant must establish that no genuine issue of material fact exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986).  Facts that may affect the outcome of

4

a suit are "material."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986); <u>Horowitz v. Fed. Kemper Life Assurance Co.</u>, 57
F.3d. 300, 302 n.1 (3d Cir. 1995).

All facts are viewed and all reasonable inferences are drawn
"in the light most favorable" to the non-movant.  <u>Pa. Coal Ass'n
v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995).  <u>See also</u>
<u>Matsushita</u>, 475 U.S. at 587; <u>United States v. Diebold, Inc.</u>, 369
U.S. 654, 655 (1962).  "[T]he nonmoving party must come forward
with 'specific facts showing that there is a <u>genuine issue for
trial</u>.'"  <u>Matsushita</u>, 475 U.S. at 587 (<u>quoting</u> Fed. R. Civ. P.
56(e)).  "Where the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party, there is
no 'genuine issue for trial.'"  <u>Id.</u>  "[C]ourts may not make
credibility determinations or weigh the evidence when confronted
with a motion for summary judgment."  <u>Catanzaro v. Weiden</u>, 140
F.3d 91, 93 (2d Cir. 1998).

B.   <u>Does the Contract Preclude Setoff or Recoupment?</u>

ICX asserts that it has the right to set off or recoup its
damages for rejection of the Distribution Agreement against sums
it owes on the USE Notes.

The Trust contends that the parties' contracts preclude the
assertion of setoff or recoupment by ICX.  Specifically, the
Trust argues that the USE Notes state that they shall be paid in
cash.  (App. to Trust's Br. A0303)  ICX disagrees, noting that
the USE Notes and the Distribution Agreement expressly permit ICX

to "pay" the USE Notes with the 25 cent discount for each unit sold by TVC.  (App. A0303, A0342)  Therefore, ICX argues that the parties' contracts specifically permitted setoff.

The Trust cites section 6(a) of the Distribution Agreement, which it asserts establishes that setoff was not intended by the parties.  (App. AO343)  According to the Trust that provision sets forth the only remedies to which ICX is entitled on TVC's default of the minimum purchasing requirements: namely, abatement of interest on the USE Notes and an increase in TVC's purchase requirements in future periods.  (App. A0343)  The Trust argues that the Distribution Agreement does not permit other remedies, such as setoff.

ICX counters that paragraph 6 is not the provision governing remedies for breach of the Distribution Agreement, rather it provides remedies for TVC's failure to buy the minimum required units.  (App. A0343)  Instead, ICX contends that paragraph 13 provides the remedies for breach of the Distribution Agreement. (App. A0347-48)  That provision expressly reserves all remedies to which ICX may be entitled in the event of a breach of the Distribution Agreement by TVC.  (App. A0347-48)  That, ICX argues, includes the rights of setoff and recoupment.

Further, ICX argues that the rights of setoff and recoupment are remedies that are available to creditors independent of any contractual provision that allows setoff.  See, e.g., In re Holford, 896 F.2d 176, 178 (5th Cir. 1990) (finding that lessee's

6

withholding of rent to offset losses caused by landlord's fraud
was recoupment, not setoff, and was permitted notwithstanding
lack of contractual right to withhold those payments); In re B&L
Oil Co., 782 F.2d 155, 159 (10th Cir. 1986) (holding that
"application of an equitable doctrine [such as recoupment] should
not depend on whether the parties expressly anticipated the
problem" and allowing recoupment even in the absence of an
express contractual provision allowing same); In re HQ Global
Holdings, Inc., 290 B.R. 78, 82-83 (Bankr. D. Del. 2003)
(concluding that the presence of an express clause providing for
recoupment is not a prerequisite to the application of that
doctrine).   Therefore, ICX asserts that setoff and recoupment are
not barred by the parties' agreement.

    The Court agrees with ICX's last argument.   Setoff and
recoupment are not dependent on the parties' contract; rather,
they are equitable remedies available independent of any
contractual remedy.   See, e.g., University Medical Center v.
Sullivan (In re University Medical Center), 973 F.2d 1065, 1080
(3d Cir. 1992) (noting that "an express contractual right is not
necessary to effect a recoupment") (citing Holford, 896 F.2d at
178).

    Further, the Court finds that, contrary to the Trust's
argument, the parties' contracts in this case do not preclude the
application of setoff or recoupment.   Paragraph 13 of the
Distribution Agreement expressly reserves all remedies in favor

of ICX on breach.  (App. A0347-48)  In addition, paragraph 6

entitles ICX to damages if TVC purchases less than 80% of the

required purchases.  (App. A0343)  Because the Distribution

Agreement was rejected in the first year of the five year

contract, it is safe to conclude that TVC purchased less than 80%

of the requirements thereby entitling ICX to damages.  Therefore,

the Court concludes that the remedies of setoff and recoupment

are available.

    C.   <u>Setoff</u>

    ICX asserts that it has the right to set off the debt it

owes to CDI under the USE Notes against the damages it suffered

as a result of the rejection of the Distribution Agreement.  It

relies on section 553 of the Bankruptcy Code which provides, in

pertinent part, that the Bankruptcy Code "does not affect any

right of a creditor to offset a mutual debt owing by such

creditor to the debtor that arose before the commencement of the

case under this title against a claim of such creditor against

the debtor that arose before the commencement of the case."  11

U.S.C. § 553(a) (2007).

    The Trust denies that ICX has any right of setoff.

    1.   <u>Setoff is Permissive, Not Mandatory</u>

    The Trust argues preliminarily that granting setoff is

permissive rather than mandatory.  <u>See, e.g.</u>, <u>Cumberland Glass</u>

<u>Mfg. Co. v. De Witt</u>, 237 U.S. 447, 455 (1915) (application of

setoff rights applies only "as established in common law and

equitable procedure"); Cohen v. Sav. Bldg. & Loan Co. (In re
Bevill, Bresler & Schulman Asset Mgmt. Corp.), 896 F.2d 54, 57
(3d Cir. 1990) (equitable right of setoff is permissive, not
mandatory, and cannot be invoked where it would offend the
general principles of equity); United States v. Norton, 717 F.2d
767, 772 (3d Cir. 1983) (holding that "when [setoff is] properly
invoked before a court, [its application] rests in the discretion
of that court, which exercises such discretion under the general
principles of equality.") (quoting 4 Collier on Bankruptcy ¶
553.02 at 553-11 (Lawrence P. King ed., 15th ed. 1983)).

The cases cited by the Trust are unpersuasive. In
Cumberland Glass, a creditor had raised (as a defense to a suit
against it by a former bankrupt) that the claim should have been
set off against a claim it had in the bankruptcy composition
case.[3] 237 U.S. at 450-51. The creditor argued that the
bankrupt had a duty to seek setoff in the bankruptcy case and,
because it did not, the bankrupt had forfeited the right to
pursue its claim against the creditor. Id. It was in this
context that the Supreme Court concluded that the setoff
provision of the 1898 Bankruptcy Act was permissive, not
mandatory, stating that the "[setoff] section is not self-
executing, but its benefit is to be had upon the action of the

---

[3] Cumberland Glass involved the application of section 68a
of the Bankruptcy Act of 1898 to composition proceedings which
were similar to today's chapter 11 reorganization cases. 237
U.S. at 452-54.

district court only when it is properly invoked . . . ."  Id. at
457.  Because neither the bankrupt nor the creditor had asked for
setoff, the Supreme Court concluded that it had not occurred and
the bankrupt was free to pursue its claim against the creditor.
Id. at 459.  The Court stated that this was consistent with the
right of setoff generally, where a party must affirmatively seek
to have a claim against it set off against a claim it has or the
claims will be separately adjudicated.  Id. at 455-56.

     In Bevill the Third Circuit stated that the Bankruptcy Code
setoff "provision is permissive rather than mandatory, and cannot
be invoked in a case where the general principles of setoff would
not justify it."  896 F.2d at 57.  In response to the debtor's
assertion that the creditor's right of setoff should be denied
because it had unclean hands, however, the Bevill Court concluded
that there was no equitable reason to deny the creditor's right
of setoff.  Id. at 61.  In fact, the Court in Bevill allowed the
creditor to set off its breach of contract claim against the
debtor's claim for breach of another contract, finding they were
mutual debts, although it did not allow the creditor to set off
its claim against property of the debtor which the creditor held
in trust for the debtor, finding that the creditor's obligation
to return the debtor's property was not a debt.  Id. at 57-58
(citing In re Windsor Commc'ns Group, Inc., 79 B.R. 210, 217
(E.D. Pa. 1987) (concluding that creditor that had converted
debtor's property was not entitled in equity to a right of setoff

in part because the conversion did not create a "debt")).

Finally, the Norton case is not instructive because in that case the IRS had exercised its right of setoff without first seeking relief from the automatic stay and after the debtor's chapter 13 plan had been confirmed providing for payment of the IRS's claim over three years.  717 F.2d at 769, 774.

The Court concludes from those cases that a creditor's right of setoff may be denied only if there is some basis in equity to do so.  See, e.g., Bevill, 896 F. at 57-59 (denying setoff against property held in constructive trust for the estate); Norton, 717 F.2d at 771, 774 (denying setoff where creditor's action violated automatic stay and terms of confirmed plan); Windsor, 79 B.R. at 217 (denying setoff where creditor had converted property of the estate).

The Trust does not argue in this case that ICX has engaged in any specific inequitable conduct.  Rather, the Trust simply argues that it would be "inequitable" to allow ICX to set off its claim against the amounts owed by it.  The Trust notes that the USE Notes are the bulk of the assets which the Debtors transferred to the Trust for the benefit of the general unsecured creditors.  Even if the Trust collects on those Notes, the unsecured creditors in this case will receive less than 2% of their claims.  Thus, the Trust argues that ICX should not be permitted to exercise its setoff rights and deprive the unsecured creditors of a substantial portion of their expected recovery.

11

The Court rejects this argument.  Equity does not mandate
that one creditor lose rights it has under state law and the
Bankruptcy Code simply because other creditors will benefit by
that loss.  In fact, the equitable doctrines of setoff and
recoupment expressly permit the result which the Trust seeks to
avoid.  See, e.g., B&L Oil, 782 F.2d at 157 ("In bankruptcy, both
recoupment and setoff are sometimes invoked as exceptions to the
rule that all unsecured creditors of a bankrupt stand on equal
footing for satisfaction.  Recoupment or setoff sometimes allows
particular creditors preference over others."); Lee v. Schweiker,
739 F.2d 870, 875 (3d Cir. 1984) ("Setoff, in effect, elevates an
unsecured claim to secured status, to the extent that the debtor
has a mutual, pre-petition claim against the creditor."); Express
Freight Lines, Inc. v. Kelly (In re Express Freight Lines, Inc.),
130 B.R. 288, 291 (Bankr. E.D. Wis. 1991) (noting that
"Bankruptcy Courts have consistently allowed setoff even though
this right is 'at odds with the fundamental bankruptcy principle
of equality of distribution among creditors because it permits a
creditor to obtain full satisfaction of a debt by extinguishing
an equal amount of the creditor's obligation to the debtor.'
Courts have allowed this right because without it, it would be
unfair to require a creditor to pay in full what is owed to the
debtor only to receive a portion, if that, of its claim against
the debtor.")

12

The Trust asserts nonetheless that ICX is, in fact, guilty of inequitable conduct in this case sufficient to warrant disallowance of its setoff rights.  As support the Trust asserts that ICX failed to advise the Debtors, the creditors, or the Court of its setoff rights until after the Debtors had rejected the Distribution Agreement.  It points to the Motion for approval of the rejection, in which the Debtors assert that the contract should be rejected to avoid the cure claim of $1.3 million. (App. A0378)  The Trust contends that if the Debtors knew that ICX would assert a setoff of almost $5 million, they would not have rejected the Distribution Agreement.

The Court rejects this argument.  First, ICX had no duty to advise anyone of its setoff claims before the Distribution Agreement was rejected.  The rejection order (as is typical) provided that any rejection damages claim could be filed after the effective date of the rejection (in this case 70 days later). ICX filed its rejection damages claim within that deadline. Further, ICX had no duty to advise the Debtors of the effect of the rejection of the Distribution Agreement on the Debtors or their estates.  The Debtors were aware of the terms of the APA, the USE Notes, and the Distribution Agreement and had counsel available to advise them of the effect of the rejection. Therefore, the Court finds no basis to conclude that ICX acted inequitably in failing to advise the parties or the Court of the effect that rejection of the Distribution Agreement would have on

13

the estates.[4]

Further, the Court is not convinced that the Debtors'
decision to reject the Distribution Agreement would have been
different if they had known of ICX's rights of setoff.  As noted,
the Debtors owed ICX $1.3 million at the time and were seriously
in default of the Distribution Agreement.  If the Debtors had not
rejected the Agreement, but had instead assumed the Agreement,
they would have had to pay the cure amount and perform the
Agreement (or pay an administrative claim for any post-assumption
breach of that Agreement).  11 U.S.C. § 365(b)(1)(A) & (g)(2).
The Court is not convinced that the Debtors would not have
rejected the Agreement, even knowing that ICX would have a setoff
claim.

    2.    <u>Both Claims Must Be Valid</u>

There is no dispute that there is an obligation owing by ICX
under the USE Notes in the amount of $4,435,725.  The Trust
asserts that, in order to set off the USE Notes obligation
against its rejection damages claim, ICX has the burden of
establishing that it has a rejection damages claim.  The Trust

---

    [4]  The Trust also asserts that ICX "continued its deception"
by not objecting to the Global Settlement Agreement or
confirmation of the Plan, whereby the USE Notes were conveyed to
the Trust.  (Trust's Br. 8)  However, the Court notes that ICX
filed its setoff claim in July, 2003, long before the Global
Settlement Agreement was approved on February 17, 2004, and the
Plan was confirmed on February 26, 2004.  Therefore, the parties
were aware (or should have been aware) of ICX's asserted setoff
rights at the time the Global Settlement Agreement and the Plan
were negotiated and approved.

contends that ICX has failed to establish that it has such a claim.

ICX responds that there is no dispute that it has a rejection damages claim and that only the amount is in dispute. It argues that the rule which precludes the recovery of uncertain and speculative consequential damages "only applies to situations where the <u>fact of damages</u> is uncertain, not where the amount is uncertain." <u>Vanderbeek v. Vernon Corp.</u>, 50 P.3d 866, 873 (Colo. 2002) (emphasis added). ICX argues further that such a disputed material fact precludes the granting of the Trust's summary judgment motion. <u>See, e.g.</u>, <u>Elsmere Park Club Ltd. P'ship v. Town of Elsmere</u>, 771 F. Supp. 646, 651 (D. Del. 1991) ("Because genuine issues of material fact still exist on [creditor's] claim for damages, [the court] will deny both parties' motions for summary judgment on the damages issue.").

The Court agrees with ICX. The rejection of the Distribution Agreement resulted in a breach of that Agreement as of a time immediately before the petition date by operation of law. 11 U.S.C. § 365(g)(1). ICX's expert has prepared a report detailing the amount of its claim. (App. A0395-A0473) While the Trust may disagree with that assessment, it may not obtain summary judgment on that point simply by disputing it. <u>See, e.g.</u>, <u>Matsushita</u>, 475 U.S. at 586.

The Trust argues further, however, that ICX suffered no damage because the Debtors entered into the NEMRA at the same

15

time they rejected the Distribution Agreement.  The Trust argues that the parties intended the NEMRA to replace the Distribution Agreement and thereby to eliminate any claim that ICX would have to rejection damages.

ICX disagrees with the Trust's analysis.  It notes that the NEMRA itself explicitly states that it is not intended to replace the Distribution Agreement and preserves ICX's claims under the Distribution Agreement.  (App. AO372)

The Court agrees with ICX.  The Trust's argument that the parties intended the NEMRA to replace the Distribution Agreement and intended that ICX would have no right to rejection damages is belied by the express language of the parties' agreement. Paragraph 13 of the NEMRA states in relevant part that:

> [TVC] and [ICX] hereby agree and acknowledge that this Agreement is not a modification, amendment or addition to the Distribution Agreement and that the Distribution Agreement shall remain subject to [TVC's] rights and [ICX's] rights under the Bankruptcy Code.

(App. AO372)

Therefore, the Court concludes that the NEMRA does not preclude ICX from asserting damages resulting from the rejection of the Distribution Agreement.  Consequently, the Court finds that ICX can assert its rejection damages claim but that determination of the amount of that claim is disputed and mandates denial of the Trust's motion for summary judgment.

###    3.   Both Claims Must Arise Pre-petition

####    a.   Rejection Damages Claim

The Trust contends that notwithstanding sections 365(g) and
502(g)[5], rejection damages may not be treated as a pre-petition
claim and set off against a pre-petition debt owed to the Debtors
as a matter of law.  See, e.g., In re Delta Airlines, Inc., 341
B.R. 439, 448 (Bankr. S.D.N.Y. 2006) (concluding that §§ 553 and
365 were not meant to enhance a creditor's rights and, therefore,
the claim arising from a post-petition rejection of a contract
could not be set off against a pre-petition obligation owing to
the debtor).

ICX argues that the Delta decision is incorrect, runs
counter to all other courts that have addressed the issue, and
has been criticized by the commentators.  ICX asks this Court to
reject the reasoning of the Delta case and, instead, to follow
the commentators and courts which have concluded rejection
damages claims are pre-petition claims which can be set off
against pre-petition debts.  See, e.g., Public Serv. Co. of New

---

[5]  Section 365(g) provides in relevant part that "the
rejection of an executory contract . . . of the debtor
constitutes a breach of such contract . . . (1) if such contract
. . . has not been assumed . . . immediately before the date of
the filing of the petition."  11 U.S.C. § 365(g).  Section 502(g)
provides in relevant part that a "claim arising from the
rejection, under section 365 of this title . . . of an executory
contract . . . of the debtor that has not been assumed shall be
determined, and shall be allowed . . . or disallowed . . . the
same as if such claim had arisen before the date of the filing of
the petition."  11 U.S.C. § 502(g).

Hampshire v. New Hampshire Elec. Coop., Inc. (In re Public Serv.
Co. of New Hampshire), 884 F.2d 11, 15 (1st Cir. 1989) (stating
that "[w]e acknowledge that, when triggered by a timely
postpetition rejection, the relation-back rule serves to
transform a future action for breach of an executory contract
into a prepetition claim subject to setoff."); Express Freight
Lines, 130 B.R. at 293 (concluding that lease rejection damages
claim could be set off against unmatured debt represented by
note); In re Mace Levin Assocs., Inc., 103 B.R. 141, 143-45
(Bankr. N.D. Ohio 1989) (holding that landlord could set off its
rejection damages claim against debtor's claim for damages caused
by landlord's earlier failure to deliver possession of the
premises). See generally Daniel W. Linna, Jr., Contract
Rejection Damages May Not Be Eligible For Setoff After All, Says
Delta Court, Am. Bankr. Inst. J. Sept. 25, 2006, at 51; 3 Norton
Bankruptcy Law & Practice 2d § 63:4 (William L. Norton, Jr., ed.,
2006); 5 Collier on Bankruptcy ¶ 553.03[1][i] (Alan N. Resnick &
Henry J. Sommer, eds., 15th ed. rev. 2004).

The Court agrees with ICX that the reasoning in Delta is
unpersuasive.  Preliminarily, the Court notes that the conclusion
of the Delta Court that section 553 does not allow the setoff of
rejection damages against pre-petition claims against the
creditor is dicta.  The Court in Delta found that the claim
against which the creditor sought to set off its rejection
damages claim was not even a "debt" because under the contract

18

the creditor never owed the debtor any money but was only
obligated to give the debtor a credit.  341 B.R. at 450.
Further, the Delta Court found that even if it were a debt, it
did not arise pre-petition.  Id.  Therefore, the Delta Court's
determination that rejection damages cannot be set off against
pre-petition claims is unnecessary to the case and mere dicta.
See, e.g., New Port Largo, Inc. v. Monroe County, 985 F.2d 1488,
1500 n.7 (11th Cir. 1993) (Edmonson, J., concurring) ("For good
or for evil, opinion-writing judges - unlike legislators - can
make cases decide no more than the cases present.  For example,
no matter how often or how plainly a judicial panel may put in
its opinion that "we hold X," "X" is not law and is not binding
on later [courts] unless "X" was squarely presented by the facts
of the case . . . .").

      In addition, the Court disagrees with the premise of the
Delta Court's holding that section 553 unambiguously precludes
any other section of the Bankruptcy Code from "affecting" the
right of setoff that a creditor may have under state law as of
the petition date.  341 B.R. at 443.  Based on that premise, the
Delta Court concluded that sections 365(g) and 502(g), which
provide that a rejection damages claim is deemed a pre-petition
claim, cannot be considered in determining whether such a claim
can be set off against another pre-petition claim under section
553.  Id. at 446.

19

This interpretation of section 553 could lead to absurd (and clearly unintended) results.  One commentator notes that a strict reading of the Delta decision could result in rejection damages being elevated to administrative status in direct contravention of Congress' intent as expressed in section 365(g).  Vincent J. Roldan, Delta Court Holds Rejection Damages Cannot Be Offset Against Prepetition Debt To Debtor, Pratt's J. Bankr. L. (Mar. 2007).  Mr. Roldan suggests that because the Delta Court ruled that rejection damages claims are not pre-petition claims,

> a court following the reasoning in Delta may rule that the rejection damage claim 'arose' post-petition, and so it may only allow the Creditor to offset the rejection damage claim against a post-petition account payable.  This would essentially allow the Creditor to enjoy post-petition administrative claim treatment for its rejection damage claim.  The result would undermine the clear purpose of Section 365(g), which is to treat rejection damage claims as pre-petition claims.

Id.

Similarly, it would appear that the Delta reasoning would not permit a landlord to set off a security deposit which it had received from the debtor pre-petition against its rejection damages claims because "[t]he rejection claim did not 'arise' pre-petition in any sense of the word."  341 B.R. at 446. Presumably then the landlord would be obligated to return the security deposit to the debtor and collect only cents on the dollar on its rejection damages claim (which is already reduced by section 502(b)(6) to one year or 15% of the remaining term).

20

Another commentator argues that the reasoning in Delta would preclude the setoff of unmatured or contingent claims (notwithstanding the inclusion of such claims in the definition of "claim" under section 101 of the Code) because ordinarily such claims cannot be used as a setoff or counterclaim under state law.  See Linna, Contract Rejection Damages May Not Be Eligible For Setoff After All, Says Delta Court, supra at 53.  Mr. Linna contends that because a strict reading of section 553 leads to absurd results that are clearly at odds with the Bankruptcy Code, the courts should conclude that section 553 is ambiguous.  As a result, he asserts that the courts should be free to consider the impact of other sections of the Code and the policy of the Code as a whole in interpreting section 553.  Id.

The Delta Court itself acknowledged that "[t]he one exception to the plain and ordinary meaning rule may arise in the rare case where the result of a literal application of the statutory language to particular facts is so bizarre and demonstrably counterintuitive that reasonable minds must agree that the statute cannot be construed to mean what it says."  341 B.R. at 445 (citing Bob Jones Univ. v. United States, 461 U.S. 574, 586 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute."); Comm'r of Internal Revenue v. Brown, 380 B.R. 563, 571 (1965) ("Unquestionably the courts, in

21

interpreting a statute, have some 'scope for adopting a
restricted rather than a literal or usual meaning of its words
where acceptance of that meaning would lead to absurd results . .
. or would thwart the obvious purpose of the statute.'")
(citation omitted)).

     This Court agrees with the commentators and the other Courts
who have interpreted section 553.  Because adopting the literal
meaning of "affect" in applying section 553 would lead to absurd
results, the Court declines to follow the Delta decision
interpreting that term literally.  Rather, the Court concludes
that section 553 is ambiguous and must be considered together
with other sections of the Code, specifically sections 365(g),
502(g) and 101.  Congress has defined "debt" and "claim" broadly
in section 101 of the Code to include unmatured, contingent,
disputed, and unliquidated claims.  Sections 365(g) and 502(g)
provide that a rejection damages claim shall be treated as if it
arose pre-petition.  Consequently, the Court concludes that for
purposes of section 553, a rejection damages claim is a pre-
petition claim subject to setoff against any pre-petition debt
owed by the creditor to the debtor.

     There is an alternative basis for the Court's conclusion.
As one commentator notes, the Bankruptcy Code generally looks to
state law to determine the substance of any claim that a creditor
has but looks to the Bankruptcy Code itself to determine the
effect of that claim, including when it arises.  See Linna,

22

<u>Contract Rejection Damages May Not Be Eligible For Setoff After
All, Says Delta Court</u>, <u>supra</u> at 52.  Sections 365(g) and 502(g)
do not affect the substance of a rejection damages claim but only
specify when it arises.  Therefore, the Court concludes that
sections 365(g) and 502(g) must be considered in determining what
offsets are appropriate under section 553.

This conclusion is particularly appropriate in this case
because the rejection damages claim is based on a breach of a
written agreement between the parties.  Many courts have held
that a claim (albeit contingent) which is based on a written
agreement arises at the time the agreement is executed even
though the breach of the agreement does not occur until later.
<u>See, e.g.</u>, <u>Mace Levin</u>, 103 B.R. at 144 (stating that "the
characterization of rejection claims as pre-petition obligations
is not simply a legal fiction created by sections 365(g) and
502(g).  The Lease was entered into pre-petition and by virtue of
this fact imposed pre-petition obligations on both parties.").
In this case the Distribution Agreement was executed pre-petition
and ICX had a claim for enforcement of that agreement at the time
it was executed.  Therefore, it is not absurd to conclude that
the claim for rejection of that Agreement is a pre-petition claim
subject to setoff against any pre-petition obligation owed to the
Debtors.

Consequently, the Court concludes that ICX's rejection
damages claim is a pre-petition claim for purposes of setoff

23

under section 553 of the Bankruptcy Code.

        b.   <u>Obligation under USE Notes</u>

     The Trust asserts that even if the rejection damages claim is a pre-petition claim by operation of sections 365(g) and 502(g), the estate's claim on the USE Notes is a post-petition claim because payment on the Notes was not due until after the petition date.  It cites <u>Avellino & Bienes v. M. Frenville Co., Inc., (In re M. Frenville Co., Inc.)</u>, 744 F.2d 332, 335-36 (3d Cir. 1984) for the proposition that a debt arises when the cause of action underlying it accrues under applicable state law.  From that the Trust argues that a debt arises only when a right to payment on that debt arises.  (Trust's Br. 16)  In this case, the Trust contends that because ICX's default on payment of interest on the USE Notes occurred post-petition, the Trust's right to payment accrued post-petition.  Even if there had been no default in payment of interest, the Trust notes that the USE Notes did not mature until May 20, 2007.  Thus it argues that the Notes are a post-petition obligation which cannot be set off against the rejection damages which are deemed to be a pre-petition claim. <u>See, e.g.</u>, <u>Schweiker</u>, 739 F.2d at 875 (stating that "pre-petition claims against the debtor cannot be setoff [sic] against post-petition debts to the debtor.").

     ICX disagrees, contending that a claim arises when the right to payment accrues, not when the payment is due.  <u>See, e.g.</u>, <u>In re Telephone Warehouse, Inc.</u>, 259 B.R. 64, 69 (Bankr. D. Del.

2001) (<u>citing</u> <u>United States v. Gerth</u>, 991 F.2d 1428, 1433 (8th

Cir. 1993) (concluding that "[f]or setoff purposes, a debt arises

when all transactions necessary for liability occur, regardless

of whether the claim was contingent, unliquidated, or unmatured

when the petition was filed."); <u>In re Young</u>, 144 B.R. 45, 46-47

(Bankr. N.D. Tex. 1992) (stating that "[s]etoff is permitted

when, at the time the bankruptcy petition is filed, the debt is

absolutely owing but is not presently due, or when a definite

liability has accrued but is not yet liquidated."); <u>In re</u>

<u>Nickerson & Nickerson, Inc.</u>, 62 B.R. 83, 85 (Bankr. D. Neb. 1986)

(holding that "[t]he right to setoff may be asserted in

bankruptcy even though one of the debts involved is absolutely

owing but not presently due when the petition is filed.");

<u>Traders Bank of Kansas City v. Stonitsch (In re Isis Foods,</u>

<u>Inc.)</u>, 24 B.R. 75, 76 (Bankr. W.D. Mo. 1982) (finding that where

"there can be no question about the existence of the debt, and

the fact that it was 'absolutely owing,' albeit as yet unmatured,

the bank's right of setoff must be regarded as manifestly

present.")).

    ICX asserts that the debt on the USE Notes arose when they

were issued (in 2002) even though payment of the principal was

not due until 2007.  Therefore, ICX argues that it may set off

the USE Notes against the rejection damages claim it has.

    The Court agrees with ICX.  Under the Bankruptcy Code, a

"debt" is defined as "a liability on a claim."  11 U.S.C. §

101(12).  A "claim" is defined as a "right to payment, whether or
not such right is reduced to judgment, liquidated, unliquidated,
fixed, contingent, matured, unmatured, disputed, undisputed,
legal, equitable, secured, or unsecured . . . ."  11 U.S.C. §
101(5)(A).  Thus, a claim arises when the right to payment
accrues, not when payment is due.  See, e.g., Gerth, 991 F.2d at
1434 (holding that debt arose when contract was signed even
though payment was contingent on funds first being appropriated
by Congress); Young, 144 B.R. at 47 (concluding that claim for
disaster benefits did not arise until Congress passed legislation
declaring crops eligible even though Congress had passed prior
act expressing general intent to provide such benefits in
future); Nickerson, 62 B.R. at 87 (holding that insurance broker
could set off unearned premiums paid pre-petition against debt
owed it even though amount of its debt could not be calculated
until audit was performed post-petition); Isis Foods, 24 B.R. at
77 (finding that bank could set off debtor's funds deposited pre-
petition against debt represented by installment note even though
no payments were due under the note as of the petition date).

    The Frenville case cited by the Trust is clearly
distinguishable from the instant case.  In Frenville, the Third
Circuit was considering the effect of the automatic stay on a
common law right of indemnity or contribution.  744 F.2d at 334.
The Third Circuit determined that under New York law such a claim
"does not accrue at the time of the commission of the underlying

26

act, but rather at the time of the payment of the judgment
flowing from the act." Id. at 337.  The Third Circuit did take
pains to distinguish Frenville from circumstances similar to the
instant case, noting that "[t]he present case is different from
one involving an indemnity or surety contract.  When parties
agree in advance that one party will indemnify the other party in
the event of a certain occurrence, there exists a right to
payment, albeit contingent, upon the signing of the agreement."
Id. at 336 (emphasis added).

     Therefore, the Court concludes that Frenville actually
supports ICX's argument that the USE Notes claim against it is a
pre-petition claim.  In this case, ICX became obligated on the
USE Notes when it executed them in May 2002, even though payment
was due sometime in the future.  Therefore, the Court concludes
that the debt represented by the USE Notes was a pre-petition
debt.  Because the rejection damages are pre-petition debt
pursuant to section 365(g), both obligations are pre-petition
debts subject to setoff under section 553.

          4.   Both Claims Must Be Between the Same Parties

     The Trust argues that setoff is not available in this case
because the two obligations are not between the same parties.
See, e.g., In re Winstar Commc'ns, 315 B.R. 660, 662-63 (D. Del.
2004) (holding that setoff requires that the two obligations be
mutual, that is, between the same parties standing in the same
capacity).

                              27

ICX argues that the obligations are mutual because USE
Delaware is a party to both documents, the USE Notes and the
Distribution Agreement.  In this case the USE Notes are due by
ICX to USE Delaware.  The Distribution Agreement, on which the
rejection damages claim is premised, is between ICX and TVC and
USE Delaware.

The Trust contends, however, that USE Delaware was merely a
nominal party to the Distribution Agreement and that any
rejection damages are owed by TVC.  ICX disagrees, arguing that
USE Delaware was acting in its own name in executing the
Distribution Agreement, not as an agent for any other party.  Cf.
Winstar, 315 B.R. at 663 (holding that setoff denial was
appropriate where creditor - acting as agent for state - owed tax
refund to debtor, while it held claim against debtor in its own
right).  Therefore, ICX asserts that its rejection damages are
due from USE Delaware as well as from TVC.

The Court finds that this is a material issue in dispute
precluding the grant of summary judgment.  It is unclear in what
capacity USE Delaware executed the Distribution Agreement.  To
the extent that ICX's rejection damages are based only on
obligations that TVC had under the Distribution Agreement, then
only TVC may owe it.  To the extent those damages are based on
obligations that USE Delaware has, however, they may be set off
against the obligation owed by ICX to USE Delaware represented by
the USE Notes.

D.   Recoupment

The Trust asserts that ICX is not entitled to recoup its
rejection damages under the Distribution Agreement from the
amounts it owes under the USE Notes (which arose under the APA),
because the two claims do not arise from the same transaction.
See, e.g., Schweiker, 739 F.2d at 875 (stating that recoupment is
appropriate where "the creditor's claim against the debtor arises
from the same transaction as the debtor's claim . . . [and] is
essentially a defense to the debtor's claim against the creditor
rather than a mutual obligation."). The Trust argues that the
APA and the Distribution Agreement were two distinct
transactions: one for the purchase of the business and the other
for the marketing and sale of product. Therefore, it contends
that recoupment is not available in this case. See, e.g.,
University Medical Center, 973 F.2d at 1081 (concluding that
recoupment was not available for obligations arising under
agreements between the same parties covering two different
years). Further, the Trust asserts that recoupment is an
equitable doctrine and is only available where "it would be
inequitable for the debtor to enjoy the benefits of that
transaction without also meeting its obligations." Id. at 1081.

ICX argues that the APA and the Distribution Agreement were
one integrated transaction. ICX contends that if it had not
gotten the agreement with TVC to distribute its product to TVC's
established customer base and to set off purchases by TVC against

29

the USE Notes, ICX would not have agreed to pay the $25 million
purchase price for the business.  ICX asserts that its position
is supported by the documents.  The APA contains a definition of
both the USE Notes and the Distribution Agreement and attaches a
draft of both.  (App. A0314-15, A0317)  Further, ICX notes that
the APA's integration clause states that "[t]his Agreement
(including the documents referred to herein) constitutes the
entire agreement between the Parties . . . ."  (App. A0334-35)
Finally, ICX notes that both the Distribution Agreement and the
USE Notes state that the USE Notes can be satisfied by the
discount granted to TVC on each unit sold by it under the
Distribution Agreement.  (App. A0303, A0342)  ICX therefore
contends that the APA, the USE Notes, and the Distribution
Agreement were part of a single integrated transaction and
recoupment should apply.  See, e.g., In re Anes, 195 F.3d 177,
182 (3d Cir. 1999).

The Trust disputes this, asserting that the transactions
were clearly distinct.  It argues that the integration clause is
merely intended to preclude the use of parol evidence in
interpreting the APA.  It contends that it is obvious from the
two agreements themselves that they were distinct and not one.
The APA involved the sale of a business and the Distribution
Agreement was a marketing agreement.  The sale closed on May 8,
2002, while the Distribution Agreement was not executed until May
20, 2002.  The sale provided for a $25 million purchase price

30

subject only to adjustment under section 7(b) of the APA.  The
Trust maintains that the two agreements were distinct and not one
integrated transaction.

Recoupment is available only where the two obligations arise
from the same transaction.  The Third Circuit has explained that

> [f]or the purposes of recoupment, a mere logical
> relationship is not enough: the "fact that the same two
> parties are involved, and that a similar subject matter
> gave rise to both claims, . . . does not mean that the
> two arose from the 'same transaction.'" Rather, both
> debts must arise out of a single integrated transaction
> so that it would be inequitable for the debtor to enjoy
> the benefits of that transaction without also meeting
> its obligations.

University Medical Center, 973 F.2d at 1081 (quoting Schweiker,
739 F.2d at 875).  See also, HQ Global, 290 B.R. at 80-81
(recoupment typically involves a single contract).  However, the
Court concludes that whether the APA and the Distribution
Agreement were part of one integrated transaction so as to permit
recoupment is a disputed material fact which precludes the grant
of summary judgment to the Trust on this point.  See, e.g.,
Estate of Schuler v. Comm'r of Internal Revenue, 282 F.3d 575,
578 (8th Cir. 2002) (concluding that whether several transactions
are integrated steps to a single transaction is a factual
question).

E.   Is ICX's Claim Subordinate to the Lenders' Liens?

The Trust argues that even if ICX has a right of setoff, it
is subordinate to the claims of the Senior Lenders and
Subordinated Noteholders.  See Colo. Rev. Stat. Ann. § 4-9-

31

404(a)(2) (West 2007) (providing that a creditor's setoff right
is subordinate to a prior perfected security interest where the
creditor received notice of that security interest).  See also,
In re Commc'ns Dynamics, Inc., 300 B.R. 220, 223  (Bankr. D. Del.
2003) (holding that setoff right was subordinate to secured
creditor's lien where creditor claiming setoff had received
notice of the secured creditor's lien); In re Primary Health
Systems, Inc., 258 B.R. 111, 117 (Bankr. D. Del. 2001) (holding
that reclamation rights were subordinate to secured creditor's
liens).

     The Trust contends that ICX had notice of the security
interests of the Senior Lenders and Subordinated Noteholders
because they had filed financing statements in accordance with
the Uniform Commercial Code (the "UCC").  See, e.g., Moffat
County State Bank v. Producers Livestock Mktg. Ass'n, 598 F.
Supp. 1562, 1567 (D. Colo. 1984) (holding that the filing of a
UCC financing statement in livestock was sufficient notice to
creditors of security interest in proceeds thereof).  Further,
the Trust notes that ICX had actual notice of the security
interest because the APA required the consent of the secured
parties.  (App. A0326-28)  Because the claims of the secured
parties far exceed the value of the Debtors' assets, the Trust
contends that ICX's claim must be treated as unsecured.

     ICX disagrees.  Preliminarily, ICX argues that the Trust
does not have standing to assert the rights of the secured

parties.  See, e.g., People ex rel. Simpson v. Highland
Irrigation Co., 893 P.2d 122, 127 (Colo. 1995) (noting that the
requirement that a plaintiff have standing to sue prevents
"plaintiffs from asserting claims in which they have no stake,
and ensures that the jurisdiction of the courts is exercised only
when an actual case or controversy exists.").

     The Trust responds that it is not seeking to assert the
secured creditor's claims for purpose of recovering on them;
rather, it is raising those claims as a defense to the setoff
claim asserted by ICX.  The Trust contends that the concept of
standing only prevents a party from asserting a claim for
recovery but does not prevent a party from raising or challenging
another party's affirmative claims or defenses.  See, e.g.,
Mortgage Inv. Corp. v. Battle Mountain Corp., 70 P.3d 1176, 1182
(Colo. 2003) (holding that "[t]raditional concerns surrounding
standing are not implicated when a defendant's standing is
challenged; a defendant may assert an affirmative defense in
response to a complaint, which asserts that the defendant has an
interest in the action."); Simpson, 893 P.2d at 127 (same).
Further, the Trust notes that it has the authority and the
obligation under the Plan to object to claims, which is what it
is doing with respect to ICX's claim.

     The Court agrees with the Trust that it has standing to
raise the secured parties' status in response to the assertion of
a right of setoff by ICX.  In this case, it is not the Trust in

33

the first instance asserting a claim (for which it must have
standing); rather the Trust is merely defending against the claim
asserted by ICX, which clearly has standing to assert that claim.
As explained by the Simpson Court, the traditional concerns about
a court's jurisdiction that underpin the standing concept

> are not implicated with respect to the defendants,
> because once the plaintiff has established standing and
> the defendants have been haled into court by the
> plaintiff, the only role for the defendants is to
> defend against the suit.  The defendants' affirmative
> defense does not constitute an independent cause of
> action, but is a defensive claim only.  Therefore, the
> rules for determining whether a plaintiff has standing
> are simply inapplicable . . . .

893 P.2d at 127.

ICX also argues that "a secured party's security interest is
subject to setoff defense or claim in recoupment arising from the
transaction that gave rise to the relevant contract."  5 Collier
on Bankruptcy ¶ 553.12[1] (Alan N. Resnick & Henry J. Sommer,
eds., 15th ed. rev. 2007) (emphasis added).  It also argues that
"a secured party's security interest in collateral is also
subject to any setoff defense or claim in recoupment arising from
other transactions, provided that the defense or claim accrued
prior to [ICX's] receipt of notification of the assignment of the
collateral to the secured party."  Id. (emphasis added).

The Court notes that despite the use of the word setoff,
Collier is properly noting the distinction between recoupment
(which is not subordinate to the claims of a secured party) and
setoff (which is subordinate to the claims of a secured party

34

once notice is received).  Under the express language of the UCC,
ICX's recoupment rights, if any, are not subordinate to the
Senior Lenders' or the Subordinated Noteholders' liens.  See
Colo. Rev. Stat. Ann. § 4-9-404(a)(1) ("the rights of an assignee
[the Senior Lenders and Subordinated Noteholders] are subject to:
(1) All terms of the agreement between the account debtor [ICX]
and assignor [Debtors] and any defense or claim in recoupment
arising from the transaction that gave rise to the contract.").
Because there is a material issue in dispute as to whether ICX
has any recoupment rights, the Court cannot grant summary
judgment on this point.

    With respect to ICX's setoff rights, if any, the UCC states
that they are subject to the rights of the Senior Lenders and
Subordinated Noteholders if financing statements were filed or
ICX otherwise had notice of their liens before its setoff rights
accrued.  See Colo. Rev. Stat. Ann. § 4-9-404(a)(2) ("the rights
of an assignee [the Senior Lenders and Subordinated Noteholders]
are subject to: . . . (2) Any other defense or claim of the
account debtor [ICX] against the assignor [Debtors] which accrues
before the account debtor [ICX] receives a notification of the
assignment authenticated by the assignor [Debtors] or the
assignee [the Senior Lenders and Subordinated Noteholders].").

    ICX contends, however, that the rights of the Senior Lenders
and Subordinated Noteholders to the collateral at issue (the USE
Notes) have been waived under the terms of the Global Settlement

35

Agreement.  Specifically, it notes that in paragraph 3(a)(2) the
Senior Lenders expressly released any lien they may have had
against the USE Notes and in paragraph 6(a) the Subordinated
Noteholders granted a release.  (App. A0502, A0505)

The Trust responds that the release granted by the
Subordinated Noteholders was only of the Senior Lenders and,
therefore, not of the interest they had in the USE Notes.

The Court concludes that to the extent that the Senior
Lenders released any security interest in the USE Notes, that
security interest is no longer an impediment to ICX's assertion
of a setoff right against those Notes.  Further, the position of
the Trust that the Subordinated Noteholders still hold an
interest in the USE Notes appears to be in conflict with its
assertion that the USE Notes were transferred to the Trust under
the Plan for the benefit of the unsecured creditors.[6]  Because
this is a material issue in dispute, the Court is unable to grant
summary judgment on this point.

      F.   <u>Is ICX's Claim Precluded by Waiver, Estoppel, or Accord
and Satisfaction?</u>

         1.   <u>Waiver</u>

The Trust also argues that any claim ICX may have of setoff
or recoupment is precluded by the equitable doctrines of waiver

_____

    [6]   The Trust acknowledges that "there may be some ambiguity
regarding the USE Note pledged to the Subordinated Noteholders.
Specifically, there may be an issue whether that particular note
remains subject to their liens."  (Trust's Br. 27 n.15.)

and/or estoppel.  It asserts that ICX waived any setoff or recoupment rights when it insisted that the Debtors reject the Distribution Agreement and "replace" it with the NEMRA.

ICX argues that waiver requires a showing of intent to relinquish or abandon a claim.  See, e.g., Johnson v. Zerbst, 304 U.S. 458, 464 (1938); People v. Bottenfield, 159 P.3d 643, 644 (Colo. Ct. App. 2006).  Consequently, ICX argues, it is inappropriate to grant summary judgment in favor of the Trust on this issue.  ICX argues further, however, that the parties' agreement itself demonstrates that there was no intent by ICX to waive any of its rights.  Specifically, ICX notes that the NEMRA expressly preserved all of ICX's rights under the Distribution Agreement.

The Court concludes that ICX is correct: there was no waiver.  A waiver is the "intentional relinquishment or abandonment of a known right or privilege." Johnson, 304 U.S. at 464.  See also Bottenfield, 159 P.3d at 644.  Waiver may be implied from conduct but "[t]he conduct must be free from ambiguity and clearly manifest the intention not to assert the benefit." Cooper v. First Interstate Bank of Denver, N.A., 756 P.2d 1017, 1019 (Colo. Ct. App. 1988).

In this case, the NEMRA unambiguously preserves any claims that ICX might have under the Distribution Agreement.  (App. A0372) This evidences no intent to waive such rights.  Therefore, the Court concludes that ICX did not waive any right to assert

37

rejection damages under the Distribution Agreement or the right
to set off or recoup those damages against its obligations under
the USE Notes.

    2.  <u>Equitable Estoppel</u>

The Trust also asserts that the doctrine of equitable
estoppel (or implied waiver) precludes ICX from now asserting
that it is entitled to set off or recoup its rejection damages
claim against the USE Notes.  The Trust notes the conduct of ICX
in insisting that the Debtors reject the Distribution Agreement
and replace it with the NEMRA.  In the motion for approval of the
rejection of the Distribution Agreement and approval of the
NEMRA, the Debtors stated that it was more cost-effective than
assuming the Distribution Agreement and paying the cure of $1.3
million.  (App. A0375-81)  The Trust contends that because ICX
did not object to that motion, the Debtors were led to believe
that ICX agreed with those statements.

ICX disputes these facts and argues that it is inappropriate
to grant summary judgment on this point as a result.  It also
argues that equitable estoppel requires a showing of intent,
which the Trust has not established.  <u>See, e.g.</u>, <u>Abromeit v.
Denver Career Serv. Bd.</u>, 140 P.3d 44, 52-53 (Colo. Ct. App. 2005)
(holding that equitable estoppel applies when "the party to be
estopped [knows] the facts and either intend[s] the conduct to be
acted on or so act[s] that the party asserting estoppel must be
ignorant of the true facts, and the party asserting estoppel must

38

rely on the other party's conduct with resultant injury.").

The Trust responds that the crux of estoppel is reliance,
not intent. See, e.g., Lynq v. Payne, 476 U.S. 926, 935 (1986)
("An essential element of any estoppel is detrimental reliance on
the adverse party's misrepresentations.").

To establish equitable estoppel, a party must show that "(1)
he lacked the knowledge of the true facts or he lacked the means
to obtain the truth; (2) he relied on the conduct of the party
against whom the estoppel is claimed; and (3) he suffered a
prejudicial change of position as a result of his reliance."
Benitec Australia, Ltd. v. Promega Corp., No. Civ. A. 04-889,
2005 WL 549552, at *5 (D. Del. Mar. 8, 2005). See also,
Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 148 (3d Cir.
1999) (holding that to establish equitable estoppel or implied
waiver a party must show it was misled and prejudiced by
another's conduct).

The Court concludes that the Trust has failed to establish
that equitable estoppel applies in this case.  First, the Court
does not find that the Debtors lacked knowledge of the true facts
or lacked the means to obtain the truth.  The Debtors were aware
of the terms of the parties' agreements and were represented by
counsel.  They therefore had the ability to determine for
themselves the full impact on the estate of rejection of the
Distribution Agreement.  Second, as noted above, the Court finds
that ICX had no duty to advise the Debtors of the effect of the

39

rejection of the Distribution Agreement.  Therefore, it would not be reasonable for the Debtors to rely on the failure of ICX to respond to the Motion to reject the Distribution Agreement as a confirmation of what the Debtors recited therein.  Finally, the Court is not convinced that the Debtors would have changed their position (and not have rejected the Distribution Agreement) if ICX had informed them of its right to assert setoff or recoupment.  Because of the cost of performing the Distribution Agreement (which TVC had been unable to do pre-petition) and the possibility of an administrative expense if the Debtors had been unable to perform after assuming it, the Court cannot conclude that the Debtors relied on any representation of ICX in deciding to reject the Distribution Agreement.  Therefore, the Court cannot find that the Debtors were prejudiced by the alleged conduct of ICX.  Consequently, the Court concludes that equitable estoppel does not apply.

### 3.   Accord and Satisfaction

The Trust also asserts that the facts support a finding that the parties entered into an accord and satisfaction.  It contends that an accord and satisfaction requires "(1) a bona fide dispute among the parties as to the amount of the debt must honestly exist, (2) the debtor tendered an amount to the creditor in honest belief that such would constitute satisfaction of the debt, and (3) the creditor accepts such payment."  Benitec Australia, 2005 WL 549552, at *5.  The Trust's contention is, in

essence, that the execution of the NEMRA was to satisfy the
Debtors' obligations under the Distribution Agreement and that
ICX's acceptance of the NEMRA created an accord and satisfaction.

The Court does not agree.  The NEMRA itself states that all
of ICX's rights under the Distribution Agreement are preserved.
(App. A0372)  Therefore, the execution of the NEMRA cannot be a
satisfaction of ICX's rights under the Distribution Agreement.
The doctrine of accord and satisfaction simply does not apply
here.


IV.  <u>CONCLUSION</u>

For the reasons stated above, the Court will deny the Motion
for Summary Judgment filed by the Trust.

An appropriate Order is attached.


Dated: February 21, 2008        BY THE COURT:

                                Mary F. Walrath
                                United States Bankruptcy Judge